UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
DANIEL F. REEDY,

                         Plaintiff,

   -v-                                            1:06-CV-762

COMMISSIONER OF SOCIAL SECURITY,

                         Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                    OF COUNSEL:

TOBIN AND DEMPF, LLP                  R. CHRISTOPHER DEMPF, ESQ.
Attorneys for Plaintiff
33 Elk Street
Albany, NY 12207

OFFICE OF REGIONAL GENERAL COUNSEL    MARIA P. FRAGASSI SANTANGELO,
SOCIAL SECURITY ADMIN. REGION II       ESQ.
Attorneys for Defendant
26 Federal Plaza Room 3904
New York, NY 10278

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

       This matter is brought pursuant to §§ 205(g) & 1631(b)(3) of the Social Security Act, as amended, 42 U.S.C. §§ 405(g) & 1383(c)(3), to review a final determination of the Commissioner of Social Security denying the plaintiff's claim for Social Security Disability and Supplemental Security Income benefits. The parties have filed their briefs, including the Administrative Record on Appeal, and the matter has been submitted for decision without oral argument.

## II. BACKGROUND

Claimant Daniel F. Reedy ("claimant" or "Reedy") filed an application for Social Security Disability and Supplemental Security Income benefits on July 24, 2003 alleging an onset of disability as of September 1, 2001.  Plaintiff complains of chronic pain throughout his body including back pain, chronic fatigue, depression, and mood disorder.  The application also asserts that claimant became disabled as of April 30, 1997 due to "Goodpastures Disease."  His application was denied on January 26, 2004.  At Reedy's request, a hearing was held on November 30, 2004.  On October 27, 2005, Administrative Law Judge ("ALJ") John Murdock issued a decision denying claimant's application.  Claimant appealed, and on April 17, 2006, the Appeals Council denied review.  Accordingly, the ALJ's decision denying benefits became the final decision of the Commissioner and claimant filed this action.

## III. DISCUSSION

### A. Standard of Review

The scope of a court's review of the Commissioner's final decision is limited to determinating whether decision is supported by substantial evidence and the correct legal standards were applied.  Poupore v. Astrue, 566 F.3d 303, (2d Cir. 2009) (per curiam) (citing Machadia v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002).; Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987)).  "Substantial evidence means 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Poupore, 566 F.3d at 305 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)).  "To determine on appeal whether an ALJ's findings are supported by substantial

evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).  If the commissioner's disability determination is supported by substantial evidence, that determination is conclusive.  Id.

However, "where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards," the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. Martone, 70 F. Supp. 2d at 148 (citing Johnson, 817 F.2d at 986).

A reviewing court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); see Martone, 70 F. Supp. 2d at 148.  "Remand is appropriate where there are gaps in the record or further development of the evidence is needed," such as where new, material evidence has become available.  42 U.S.C. § 405(g); Martone, 70 F. Supp. 2d at 148 (citing Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980)).  A remand for rehearing directing the taking of additional evidence is warranted only if it is shown that new, material evidence "'and that there is good cause for the failure to incorporate such evidence into the record'" at the administrative hearing.  Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 643-44 (2d Cir. 1983) (quoting 42 U.S.C. § 405(g), as amended in 1980)).  Remand may also be appropriate if the Commissioner "misapplies the law or failed to provide a fair hearing."  Id. at 644.  However, where the underlying administrative decision is not supported by substantial evidence, reversal is appropriate

because there would be no useful purpose in remanding the matter for further proceedings. Id. (reversing and remanding solely for calculation of benefits, subject to determination by the district court of any motion by the agency to remand to consider new evidence); Parker, 626 F.2d at 235 (reversing and remanding solely for calculation and payment of benefits); Simmons v. United States R.R. Ret. Bd., 982 F.2d 49, 57 (2d Cir. 1992) (same); Williams, 859 F.2d at 261 (same).

### B.  Disability Determination - The Five Step Evaluation Process

The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

Id. § 423(d)(2)(A).

The Administrative Law Judge ("ALJ") must follow a five step evaluative process in determining whether an individual is disabled. See 20 C.F.R. §§ 404.1520, 416.920. In the first step the ALJ must determine whether the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity he is not disabled and he is not entitled to benefits. Id. §§ 404.1520(b), 416.920(b).

If the claimant is not engaged is substantial gainful employment, then step two requires the ALJ to determine whether the claimant has a severe impairment or combination of impairments which significantly restricts his or her physical or mental ability to perform basic work activities.  Id. §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer from a severe impairment, then step three requires that the ALJ determine whether the impairment meets or equals an impairment listed in Appendix 1 of the regulations. Id. §§ 404.1520(d), 416.920(d); see also id. Part 404, Subpt. P, App. 1.  If so, then the claimant is "presumptively disabled."  Martone, 70 F. Supp. 2d at 149 (citing Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires the ALJ to assess whether the claimant's residual functional capacity ("RFC") precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).

If the opinion of a treating physician is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record'" it is given significant weight.  Poupore, 566 F3d. at 307 (quoting 20 C.F.R. § 404.1527(d)(2)).  However, where the treating physician's opinion is not supported by medical evidence, it is not entitled to significant weight.  Id.

The burden of proof with regard to the first four steps is on the claimant.  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Ferraris, 728 F.2d at 584.

If it is determined that claimant cannot perform past relevant work, the burden shifts to the agency for the fifth and  final step.  Perez, 77 F.3d at 46.  This step requires the agency to examine whether the claimant can do any type of work.  Id. §§ 404.1520(g), 416.920(g).  The regulations provide that "factors such as a claimant's age, education, and

previous work experience" should be evaluated to determine whether a claimant has the residual functional capacity to perform work in any of five categories of jobs: very heavy, heavy, medium, light, and sedentary." Perez, 77 F.3d at 46 (citing 20 C.F.R. § 404, Subpt. P, App. 2).  "[T]he Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity."  Poupore, 566 F.3d at 306.

A claimant may seek review of an adverse decision by the ALJ from the Appeals Council.  Perez, 77 F.3d at 44.  If review is granted, the decision of the Appeals Council is the final decision of the Commissioner.  Id.  If review is denied, then the final decision is that of the ALJ.  Id.  The final decision is judicially reviewable pursuant to 42 U.S.C. § 405(g).

### C. Analysis

The ALJ first found that claimant had not engaged in substantial gainful activity since the alleged onset date of September 1, 2001.  At the second step, the ALJ reviewed claimant's alleged impairments.  The ALJ found that the claimant did not have a severe mental impairment.  He further found that Reedy's history of Goodpastures Syndrome[1] did not constitute a severe impairment.  The ALJ determined that claimant's history of shoulder injury was not a severe impairment.

With regard to claimant's back disorder, the ALJ found that it was a severe impairment but did not meet or medically equal any one or combination of impairments in Appendix 1, Subpart P, Regulation No. 4.

---

[1] Goodpastures Syndrome is a disease of the kidneys also characterized by spitting blood from the lungs. Stedman's Medical Dictionary 726, 781, 1730 (Marjory Spraycar ed., 26th ed. 1990). It generally follows a rapid progression to death from renal failure. Id. at 1730.

Given these determinations, the next step was for the ALJ to determine Reedy's residual functional capacity to perform past relevant work or other work existing in significant numbers in the national economy. The ALJ considered all of claimant's symptoms including pain which could reasonably be accepted as consistent with objective medical evidence, as well as medical opinions.

As to activities of daily living, the ALJ noted that Reedy reported that he takes care of his two children, but that sometimes his mother or someone else will take care of them. Claimant reported that sometimes he could not walk, get out of bed, get off the floor, or bend because his body hurts to move, until he takes medication. He reported occasionally preparing meals, doing dishes, or doing laundry. He also reported visiting family two or three times a week and sometimes going shopping for a short period of time. He reported reading and listening to music every day. Reedy further reported that he was able to take care of his own personal needs. However, he reported that his girlfriend does the laundry, shopping, manages the money, and does the chores. The girlfriend confirmed this.

With regard to plaintiff's complaints of debilitating pain, the ALJ found claimant less than credible. One of the bases for finding a lack of credibility was the report of medical expert Judith Brendemuehl, M.D. After reviewing his medical records, Dr. Brendemuehl opined that claimant's condition does not meet or equal a listing and that based upon the physical evidence he could perform medium work. (R. 723.) In part, her finding rested on notations in the records that claimant magnified his symptoms and exhibited drug-seeking

behavior. Id.   She stated that recent notations in the records also suggest malingering and Munchausen Syndrome[2] as possible diagnoses. (R. 723.)

Claimant contends that it was error to permit her to opine as to his credibility. However, Dr. Brendemuehl's statements are supported by the record, including the records from Reedy's treating physician, Leah Berkery, M.D.   For example, on February 2, 2005, Reedy called to get another prescription for oxycontin, a controlled substance, stating that the pharmacy he used before no longer felt comfortable filling his prescriptions. Id. at 689. Another note on February 22, 2005, reported that claimant called and stated he could not find his oxycontin or valium bottles and thought his girlfriend threw them out. Id.  He was told that he should report this to the police. Id.  Reedy called back and said he found the pills in a drawer. Id.  In a disability report claimant filled out on April 22, 2004, in answer to the question if he had any new physical or mental limitations as a result of his condition, claimant responded "stress to the millionth power." Id. at 156.

The record contains support for Dr. Brendemuehl's opinion, as well as the ALJ's finding that Reedy's complaints of debilitating pain were not credible.

In 1997, a magnetic resonance imaging ("MRI") study showed no pathology of the spine and no inflammatory joint disease. Id. at 195.  A discharge summary from Albany Medical Center dated November 30, 1998, stated "The patient difficult to evaluate because his complaints do not correlate with physical findings or laboratory data." Id. at 202.  A discharge summary from Albany Medical Center from April 29, 1999, stated that upon

---

[2] Munchausen Syndrome refers to patients who fabricate "clinically convincing simulations of disease for the purpose of gaining medical attention," often wandering "from hospital to hospital feigning acute medical or surgical illness and giving false and fanciful information about their medical and social background for no apparent reason other than to gain attention." Stedman's Medical Dictionary, supra note 1, at 1736.

"admission to hospital patient's pain requirement seemed very large." Id. at 210. Further, the "[p]ossibility of Munchausens syndrome was entertained." Id. Reedy refused to void in the presence of hospital personnel and presented grossly bloody urine. Id. However, urine retrieved directly from the ureters had no blood. Id.

Claimant had a history of multiple surgeries, including pyloric stenosis as a child, traumatic amputation of a finger, hernia repair, hand surgery, knee surgery, and foot surgery. Id. at 174, 715. He has also had multiple hospital admissions, such as the following. Reedy was admitted to Albany Memorial Hospital in February 2002, Albany Medical Center in April 2003, St. Peter's Hospital in June 2003, and St. Peter's Hospital in July 2003. Id. at 347, 381, 420, 429, 438. The Albany Medical Center raised questions about Munchausen's because of inconsistencies in symptoms and clinical findings. Id. at 421. At St. Peter's Hospital in June 2003 he was coughing up blood but did not want to be admitted, stating that he just wanted pain medications and to go home. Id. at 432-33. The July 2003 St. Peter's Hospital records state "The patient is a somewhat unreliable informant." Id. at 438.

Claimant's discharge summary from St. Peter's in July 2003 was completed by Dr. Berkery. She noted that questions had been raised about Munchausen's or symptom magnification. Id. at 441. She told Reedy that the prescription she gave him for pain medication was enough for thirty days and he would not be given more until 30 days were up. Dr. Berkery's first report of July 14, 2003, questioned Reedy's symptoms and clinical results. Id. at 447. For example, he had a history of blood in his urine, but urine obtained by catheteritzation tested negative for blood. Id. This raised the question of whether he was adding extraneous blood to his urine so that it would test positive. Id. Based upon her review of Reedy's records, she noted that in her treatment of him she would observe him for

signs of Munchausen's Syndrome or malingering. Id. at 448. Claimant saw Dr. Berkery at least eight times after his discharge through October 2003. Id. at 486-93.

Dr. Berkery referred claimant to a pain management specialist in August 2003. Edward Apicella, M.D. reported that there was no skeletal evidence of an abnormality that would cause back pain. Id. at 478. He recommended physical fitness, possibly through physical therapy. Id. Dr. Apicella declined to prescribe any other treatment, opining that given his history, prescribing controlled substances for Reedy would not be in the patient's best interest. Id. Dr. Berkery continued to prescribe narcotic pain medications for Reedy at least throughout 2004.

In addition to the evidence from the record set forth above that supports the ALJ's reliance on Dr. Brendemuehl's opinion that claimant's complaints of pain were not credible, there is minimal objective medical evidence in support of Reedy's subjective complaints of pain. A 1997 MRI showed no abnormalities. Id. at 477. A 2002 MRI showed no evidence of disc herniation, only a mild disc bulge at L4-5. Id. A 2003 MRI showed no herniation but a slight bulge at C5-6 and a very slight bulge at C6-7. Id. at 534. Dr. Apicella, a pain specialist, recommended no treatment other than physical fitness and possible physical therapy. Id. at 478. A 2004 study revealed a disc protrusion of L3-4 that may impinge on the left L3 nerve root. Id. at 574. This was described as "mild degenerative change of the lumbar spine." Id. at 575.

While there is evidence of mild carpal tunnel syndrome, id. at 578, there is no complaint that this causes pain. Similarly, there is evidence of ongoing denervation due to an old right long thoracic nerve injury, id., but no indication how that contributed to Reedy's complaints of pain. Claimant also points to objective evidence of blunting of the right

costophrenic angle consistent with chronic pulmonary changes, id. at 579, but fails to show how that would exacerbate his low back pain.

Reedy also contends that contrary to the ALJ's finding, the psychiatric consult by Seth Rigberg, Ph.D., on December 17, 2003, indicates a significant impairment of his ability to function. To the contrary, Dr. Rigberg's observations indicate minimal psychiatric impact upon Reedy's vocational functional abilities. Id. 508-12. Dr. Rigberg opined that claimant could follow simple directions and instructions, perform simple tasks, had trouble maintaining concentration and attention, could not perform complex tasks independently, could make appropriate decisions, could relate appropriately to others, and could deal with mild stress.

The ALJ declined to give significant weight to the opinion of Reedy's treating physician Dr. Berkery that was contained in a note dated February 14, 2005, stating that he suffered from disabling chronic back pain that prevented him from working. See id. at 719. According to claimant, the ALJ did not properly credit Dr. Berkery's opinion. However, it is the decision of the Commissioner to determine whether a claimant meets the statutory definition of disability; therefore, a statement that a claimant is disabled is not binding. See 20 C.F.R. §§ 204.1527(e)(1), 416.927(e)(1). The ALJ properly reviewed all of Dr. Berkery's notes and the other medical evidence in the record before determining that Reedy is not disabled.

Claimant argues that the ALJ was incorrect as a matter of law that he can do medium work and his past relevant work of janitor because he cannot engage in activities for sustained periods. However, Reedy stated that he cares for young children daily and at one time provided day care in a relative's home. Moreover, there is no evidence that claimant cannot perform sustained activities except his own self-serving testimony, which has properly

been discounted. Claimant's past relevant work of janitor is performed at the medium exertional level.[3]

Reedy argues that the ALJ improperly relied on the grid, which is not applicable when nonexertional limitations are present. However, the ALJ concluded at step 4 that claimant could perform his past relevant work of janitor therefore did not consult the grid.

Finally, Reedy contends that new evidence in the form of a (new) treating physician's progress notes from October 2005 to March 2007 justify reversal and/or remand. The proffered progress notes do not relate to the time period considered by the ALJ, therefore the evidence is not material. See Lisa v. Secretary of Dep't of Health & Human Servs., 940 F2d 40, 43 (2d Cir. 1991). Additionally, claimant only states in conclusory terms that a new ALJ would find the new evidence important. He does not show how the evidence would have influenced the decision below. See id. Further, it is apparent that the evidence would not have influenced the ALJ's decision, since it covers a time period after the decision. Moreover, the evidence is merely repetition of Reedy's claims to his prior physicians that he is in pain and in need of pain medications and is disabled from working due to Goodpastures Syndrome, low back pain, and anxiety and depression. There is nothing new in the "new" records.

## IV. **CONCLUSION**

The ALJ's decision that Reedy could perform his past relevant work of janitor at a medium exertional level is supported by substantial evidence.

---

[3] The Dictionary of Occupational Titles provides that a janitor performs at the medium exertional level. DICOT 382.664-010, 1991 WL 673265 (4th ed. 1991). Additionally, it states that exposure to toxic caustic chemicals, which would be contraindicated for Reedy due to his asthma, does not exist for this job title. Id.

Accordingly, it is

ORDERED that

1. Plaintiff's motion for judgment on the pleadings is DENIED;

2. Defendant's motion for judgment on the pleadings is GRANTED; and

3. The complaint is DISMISSED.

IT IS SO ORDERED.

United States District Judge

Dated:  September 30, 2009
        Utica, New York.